221 N.J. Super. 347 (1987)
534 A.2d 724
FRED VASSALLO, PLAINTIFF-RESPONDENT,
v.
WESLEY K. BELL, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 5, 1987.
Decided December 3, 1987.
*353 Before Judges PETRELLA, BAIME and ASHBEY.
McGimpsey & Cafferty, attorneys for appellant (A.F. McGimpsey Jr. and Thomas J. Cafferty, on the brief).
*354 Hogan & Palace, attorneys for respondent (Michael R. Scully on the brief).
The opinion of the court was delivered by PETRELLA, P.J.A.D.
This appeal involves the somewhat murky and expanding law of defamation and implicates concepts involving public figures, matters of public concern and the applicability of the "actual malice" standard. A jury awarded a verdict of $7,000 in compensatory damages and $45,000 in punitive damages in favor of plaintiff Fred Vassallo in his defamation suit against defendant Wesley K. Bell. Defendant appeals on the ground that various errors were committed at trial. We reverse and remand.
Defendant Bell argues on this appeal that (1) the trial judge erred in determining that plaintiff Vassallo was neither a public official nor a public figure; (2) Vassallo failed to prove actual malice as required in this type of case; (3) the allegedly defamatory statements involved matters of public concern and a common law qualified privilege; (4) the charge to the jury was erroneous in various respects; (5) there was no basis to support an award of punitive damages, and (6) a punitive damage award is contrary to Article I, paragraph 6 of the New Jersey Constitution and to the Federal Constitution.
Plaintiff's complaint alleged that Bell, while mayor of Stafford Township, mailed a letter in 1983 to approximately 3,000 township voters which falsely stated that Vassallo had been dismissed as Municipal Building Inspector because of sexual harassment of female municipal employees and improper solicitation of campaign contributions while employed by the township. In his counterclaim Bell asserted that Vassallo had defamed him by publishing a 1981 letter stating that Bell was anti-Italian; that Vassallo had testified falsely during certain judicial proceedings arising from the recall election of defendant, and in other matters. Actions were filed by other former *355 municipal employees arising out of the publication of Bell's letter. Those matters were consolidated and were settled prior to trial, except for Vassallo's complaint and that of one Frank Carletto, the former chief of the township's police department.[1] The discussion that follows relates solely to the instant appeal unless otherwise stated.
In pretrial rulings the trial judge held that for trial purposes Vassallo was neither a public figure nor a public official, and that Bell was a public figure and a public official. At trial Bell's counterclaim was dismissed at the close of plaintiff's proofs.[2] After the jury returned its verdict defendant moved for a new trial or a remittitur. That motion was denied. At the hearing on the motion defense counsel represented that defendant's insurance carrier had decided to satisfy the compensatory damage aspect of the judgment.
In partial response to this appeal plaintiff points out that the jury's compensatory damage award has been paid, and thus he asserts, without citation of any authority, that we need only resolve issues raised concerning the efficacy of the punitive damage award. The matter has not been settled and the appeal was taken from the entire judgment. This was not a case where defendant was accepting the benefits of the appeal. See Adolph Gottscho, Inc. v. American Marketing Corp., 26 N.J. 229, 241-242 (1958); 4 C.J.S., Appeal and Error § 215. Almost all the cases applying a bar to an appeal refer to situations where a party accepts what is in effect considered a satisfaction of the judgment. But see Sturdivant v. General Brass & Machine Corp., 115 N.J. Super. 224, 227-228 (App.Div. *356 1971). A bar does not necessarily apply where there has been a voluntary payment of the judgment, or a partial payment as here. See Annotation, "Defeated Party's Payment or Satisfaction of, or other Compliance with, Civil Judgment as Barring His Right to Appeal," 39 A.L.R.2d 153 (1955). Thus, it was said in Beronio v. Pension Comm'n of Hoboken, 130 N.J.L. 620, 622 (E. & A. 1943):
And the second ground for dismissal is equally untenable. Submission to the mandate of the writ was pursuant to a resolution adopted by the appellant commission reciting its decision to take an appeal from the judgment and advice given by the municipal attorney that the appeal would not act as a supersedeas. In these circumstances, there was no waiver or estoppel by acts or course of conduct inconsistent with the right of appeal. This is a right favored in the law; and it will not be deemed waived except for compelling reasons. Intent is an ingredient of waiver. The course taken here did not constitute a recognition of the validity of the judgment. Appellant conceived it to be its duty to satisfy the command of the writ, and made known that compliance was not to be deemed an abandonment of its right of appeal.
It is the prevailing rule that even the voluntary payment, performance or satisfaction of a judgment, unless made in compromise or settlement of the controversy, does not ex necessitate constitute a waiver of the right of appeal, especially where repayment or restitution may be enforced, or the effect of compliance may be otherwise undone, in the event of a reversal. 4 C.J.S. 409, et seq. Moreover, the subject-matter of the action is of public concern. [Id. at 622.]
Indeed, there is less reason for a rule of abandonment of an appeal where it is the judgment debtor who makes the payment. An appeal does not automatically stay a judgment, R. 2:9-5, and in addition to enforcement proceedings, a stay may be conditioned upon the posting of a bond or payment into court. See R. 2:9-6. Interest continues to run on a judgment and the payment stops the running of interest on the amount paid. There is also an element of public interest and concern in this appeal which militates against our declaring the appeal "moot" as to the compensatory damage aspect of the jury verdict. Hence, we consider all issues in the case before us on this appeal.
Before addressing defendant's legal contentions a review of the facts is necessary for an understanding of this appeal. Vassallo was appointed Construction Code Official for Stafford *357 Township on January 1, 1981. His duties included those of building inspector, sub-code inspector and construction official. Vassallo also served as chairman of the Township's Board of Health and was a member of the Township's Municipal Utilities Authority. In addition, he held positions as building inspector or code enforcement official in five other municipalities in the area. Vassallo had also been active in Democratic party politics. He worked closely with Bell, who had been his friend, in a number of political campaigns, assisting in the raising of campaign funds.
Vassallo testified that around July 24, 1981 Bell came to his house and asked him to sign a letter of resignation from his municipal positions. Both Vassallo and his wife testified that when he refused to sign the letter Bell said, "If you don't, I'll get you one way or the other." According to Vassallo, Bell requested his resignation because he thought Vassallo was becoming too popular and influential in the township. Similar testimony was elicited from Thomas Powers, a former political ally of Bell and a former councilman. Powers testified that he was at Bell's home where ways of "getting rid" of Vassallo were discussed. In particular Bell having spoken to a councilman, learned of an alleged sexual harassment incident involving Vassallo and a municipal employee. This was to be the basis for discharging Vassallo.
Bell testified that political considerations had not motivated his attempt to discharge Vassallo. Rather, it was based on complaints he had received that Vassallo was "sexually harassing" township employees, and improperly soliciting campaign contributions on township time and while using township vehicles. Bell testified that in June 1981 Councilman Sorentino informed him of an incident of sexual harassment regarding a female employee in the tax office. The female employee testified that in April 1981 Vassallo wanted to go to lunch with her and reservations were made at Ocean Acres Country Club for Vassallo, herself and a third party. However, only Vassallo attended on the day set for the lunch, and then he asked the *358 woman to look at a house he was allegedly thinking of buying to give him an opinion on its value based upon her experience in assessing property for tax purposes. The employee testified that they drove to the house in separate cars, since they had driven to the country club separately. After Vassallo opened the door to the house with a key that he had, she said he then made a "pass" at her and tried to touch various parts of her body. She responded by "slugging" plaintiff, walking out of the house and returning to the municipal building where she told her superior of the incident. She made no other complaint until subsequently asked about it by a member of the township council. This employee also testified that for some time thereafter plaintiff would stand in front of the glass door to her office and "blow kisses" at her.
Vassallo denied these allegations. He said that the female employee had suggested the luncheon appointment and picked the country club because she wanted to see some construction going on at the location. He said that the woman had heard of a house for sale in the area owned by former Congressman Helstoski and wanted to see it. Vassallo, a former member of Helstoski's staff, went to the realtor and obtained the key and met the tax office employee at the house. According to Vassallo, the woman made a "pass" at him, and he refused her advances. He said he later told the woman that this was just between the two of them, and that he would not say anything about it.
According to Bell, when he heard about the incident he informed the other members of the council. Two councilmen were authorized to conduct an investigation and report back. In the meantime, Bell went to plaintiff's house and asked for his resignation. He said he made the request based on Vassallo's prior promise to him that "any time you want me to resign, I will." Bell told Vassallo that he wanted no "sex scandal" in the township because it might hurt his chances of being elected a State senator.
*359 Plaintiff apparently had a reputation of being a "lady's man." Bell learned from his wife about another incident in April 1981 involving a different female municipal employee. Bell's wife was in the municipal building and met Vassallo who asked her if she wanted to see something. They then walked into a female employee's office and plaintiff proceeded to kiss the employee on the ear. That employee testified about the incident and stated that while she was not happy about it, she did not feel sexually harassed. Vassallo acknowledged in his testimony that he liked to show affection to women in public by hugging or kissing them, and stated that no one had ever objected to his actions. Several female township employees testified on plaintiff's case that they knew Vassallo and were not offended by his actions.
Bell testified that he had also learned about Vassallo improperly soliciting campaign contributions for Bell's intended campaign for State senator. Bell's wife, as campaign manager and township Democratic chairperson, was planning a concert at some point in 1980 or 1981, and had prepared a list of persons to be approached about the purchase of tickets or advertising in a program to be distributed at the event. Vassallo was working on this fund raiser and had been given part of the list. According to Bell, at some time thereafter, he received a complaint that Vassallo was selling tickets on township time and while using a township vehicle. He could not identify the source of these complaints at trial, but stated that he felt that this was improper and had told Vassallo to stop because he thought that solicitation of political funds on township time presented an appearance of impropriety. Vassallo admitted making such solicitations, but said that he only did so after his part-time employment was completed at 12 noon, and that the solicitations were made using his private car.
Based on those allegations the municipal council suspended Vassallo from his position and brought formal charges seeking his removal from his municipal positions. A hearing was held in which Bell did not participate because his wife was to be a *360 witness. Because the trial judge ruled that the resolution of the municipal charges was not evidential, we are unaware of the outcome of that hearing.[3] Bell began a new four-year term as mayor on July 1, 1983.
Some time in 1983 a group calling itself "Get Rid of Wes" (GROW) organized to obtain signatures on a petition to recall Bell. Vassallo had now changed political parties and become a Republican and was active in the recall effort. He asserted that the recall had nothing to do with his dismissal or that of various other municipal employees, but was based on Bell's alleged mismanagement of township affairs and a recent increase in the municipal tax rate. Bell asserted that Vassallo had made the removal attempt an issue in the recall campaign along with allegations that Bell was anti-Italian.[4]
As a result of GROW's efforts a recall election was scheduled and a campaign mounted. Bell asserted that the firing of Vassallo and other individuals had become a campaign issue. He thus wrote a letter in November 1983 discussing the dismissal of seven former municipal employees, including Vassallo, which stated as to plaintiff:

*361 1982 Fred Vassallo  Building Inspector. Dismissed because of sexual harrassment [sic] of female employees in the municipal building and seeking and accepting monies from developers, builders and contractors on Township time, in a Township owned vehicle.
The letter was sent on stationery of the "Mayor of Stafford Township" in November 1983 to about 3,000 registered voters, according to Bell, to let them know that there were legitimate reasons for the action in dismissing defendant and other employees. In any event, Bell lost the recall election which was held on December 6, 1983 by a two to one margin.
The contents of that letter formed the basis for Vassallo's complaint that he was libeled, and that the letter had affected his relationship with friends and family. He also asserted that he was deprived of opportunities to participate in various business dealings because of that letter.
Prior to the start of trial the judge ruled that allegations of sexual harassment contained in the letter constituted libel per se. The trial judge declined, without stating findings or reasons, to rule that plaintiff was either a public official or a public figure. A determination with respect to those categories is important both from the standpoint of the compensatory damage award as well as the propriety of the punitive damage award.

I
We are satisfied that the trial judge's denial of the status of public official or public figure or at very least limited purpose public figure status to plaintiff was reversible error. In the landmark case of New York Times Co. v. Sullivan, 376 U.S. 254, 279-280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964), the Supreme Court in applying constitutional principles to defamation cases, held that the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice'  that is with the knowledge that it was false or with reckless disregard of *362 whether it was false or not." The boundaries of the designation "public official" were left open for further definition. Id. at 283 n. 23, 84 S.Ct. at 727 n. 23, 11 L.Ed.2d at 708 n. 23.
State law standards were rejected as a basis for determining who is a public official in Rosenblatt v. Baer, 383 U.S. 75, 83-84, 86 S.Ct. 669, 675, 15 L.Ed.2d 597, 604 (1966). The court said:
It is clear, therefore, that the `public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.
* * * * * * * *
Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements we identified in New York Times malice standards apply. [Id. at 85-86, 86 S.Ct. at 676, 15 L.Ed.2d at 605-606 (footnotes omitted)]
A public official's "position" must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the charges in controversy. Id. at 86 n. 13, 86 S.Ct. at 676 n. 13, 15 L.Ed.2d at 606 n. 13. See Scelfo v. Rutgers University, 116 N.J. Super. 403, 412 (Law Div. 1971) (recognizing Supreme Court's continuing expansion of the term "public official").
The New York Times rule is not limited to elected officials, but extends to appointed officials as well. Eadie v. Pole, 91 N.J. Super. 504, 508 (App.Div. 1966) (municipal tax assessor). While not every public employee is a public official, Hutchinson v. Proxmire, 443 U.S. 111, 119 n. 8, 99 S.Ct. 2675, 2680 n. 8, 61 L.Ed.2d 411, 421 n. 8 (1979), the rule is not limited to the upper echelons of government. See Theckston v. Triangle Publications, Inc., 100 N.J. Super. 452 (App.Div. 1968), certif. den. 52 N.J. 173 (1968), cert. den. 393 U.S. 1001, 89 S.Ct. 486, 21 L.Ed.2d 466 (1968) (clerk of County District Court); Eadie v. Pole, supra (tax assessor); Scelfo v. Rutgers University, *363 supra (duties of police officer particularly "governmental in character and are part of primary function of local government"). See also Annotation, "Libel and Slander: Who is a Public Official or Otherwise Within the Federal Constitutional Rule Requiring Public Official to Show Actual Malice," 19 A.L.R.3d 1361, 1371 (1968). The scope of the public official rule extends "to anything which might touch on an official's fitness for office" including personal attributes such as "dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the individual's private character." Garrison v. Louisiana, 379 U.S. 64, 77, 85 S.Ct. 209, 217, 13 L.Ed.2d 125, 134 (1964) (County District Attorney).
Based on such cases cited, a building inspector has been held to be a public official since the position "was of `such apparent importance' that the general public, and particularly the citizens of [the municipality], would have an `independent interest' in the officeholder's qualifications and performance." Dattner v. Pokoik, 81 A.D.2d 572, 573, 437 N.Y.S.2d 425, 427 (App.Div. 1981), app. dism. 54 N.Y.2d 750, 442 N.Y.S.2d 996, 426 N.E.2d 491 [Ct.App. 1981]. A building inspector is engaged in a "primary function of local government," just as a police officer is, whether or not his activities affect every citizen's life on a daily basis. See Scelfo v. Rutgers University, supra, 116 N.J. Super. at 413. These responsibilities would reasonably lead the public to have an "independent interest in the qualifications and performance of the person [holding the position]." Rosenblatt v. Baer, supra, 383 U.S. at 86, 86 S.Ct. at 676, 15 L.Ed.2d at 606.
In our view, Vassallo should have been considered a public official for purposes of his defamation action. He had been the Stafford Township's Building Inspector and a member of the Board of Health and on the Board of the Municipal *364 Utilities Authority.[5] A building inspector has certain broad powers relating to the safety and welfare of the residents of the community served. Various discretionary functions are exercised in that office, including when inspections are conducted and evaluations as to compliance with various building codes. See County of Union v. Benesch, 103 N.J. Super. 119, 125 (App.Div. 1968) (prerogative writ action concerning building inspector's discretion).
The fact that the allegedly defamatory letter was published after plaintiff left his position does not affect his public official status. In Rosenblatt v. Baer, supra, it was noted:
It is not seriously contended, and could not be, that the fact respondent no longer [held his position as recreation area supervisor] when the column appeared has decisional significance here. To be sure, there may be cases where a person is so far removed from a former position of authority that comment on the manner in which he performed his responsibilities no longer has the interest necessary to justify the New York Times rule. But here the management of the Area was still a matter of lively public interest; propositions for further change were abroad, and public interest in the way in which the prior administration had done its task continued strong. The comment, if it referred to respondent, referred to his performance of duty as a county employee. [383 U.S. at 87 n. 14, 86 S.Ct. at 676-678 n. 14, 15 L.Ed.2d at 606 n. 14]
See also Gray v. Udevitz, 656 F.2d 588, 590 n. 3 (10th Cir.1981); Pierce v. Capital Cities Communications, Inc., 576 F.2d 495, 510 and n. 67 (3rd Cir.1978), cert. den. 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978); 19 A.L.R. 3rd, supra at 1377-1378. The statements made in Bell's letter clearly related to Vassallo's fitness for the office and his activities while holding it.

II
The actual malice standard applies here not only because Vassallo qualifies as a public official, but he also qualifies as a public figure to whom that standard has been extended. Curtis Publishing Co. v. Butts; Associated Press v. Walker, 388 *365 U.S. 130, 164, 87 S.Ct. 1975, 1996, 18 L.Ed.2d 1094, 1116 (1967). Public figures have been described as individuals "intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." Id. at 164, 87 S.Ct. at 1996, 18 L.Ed.2d at 1116 (Warren, C.J., concurring). Although there is no ready formula for the application of the public figure test to a specific set of facts, see Marcone v. Penthouse Intern. Magazine for Men, 754 F.2d 1072, 1082 (3rd Cir.1985), cert. den. 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985); Rosanova v. Playboy Enterprises, Inc., 411 F. Supp. 440, 443 (S.D.Ga. 1976), aff'd 580 F.2d 859 (5th Cir.1978), a broad definition of "public figure" appears in Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974):
Those classed as public figures stand in a similar position. Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event they invite attention and comment. [Id. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808]
Gertz thus described two different classes of public figures: (1) public figures for all purposes, and (2) limited purpose public figures. Of course, "those charged with defamation cannot, by their own conduct, create their own defenses by making the claimant a public figure." Hutchinson v. Proxmire, supra, 443 U.S. at 135, 99 S.Ct. at 2688, 61 L.Ed.2d at 431. The rule usually applied is that public figure status is determined on the basis of facts preexisting the alleged defamation. See Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 591 (1st Cir.1980); Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1295 n. 19 (D.C. Cir.1980), cert. den. 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980).
Although Vassallo may have been well known in the community, the record clearly does not support a conclusion that he *366 was a person in a position of "persuasive power and influence" that would make his name a "household word." There is thus no basis to conclude that he is a general purpose public figure. Gertz v. Welch, supra, 418 U.S. at 352, 94 S.Ct. at 3013, 41 L.Ed.2d at 812. See, e.g., Tavoulareas v. Piro, 759 F.2d 90, 103 n. 12 (D.C. Cir.1985), vacated in part, 817 F.2d 762 (D.C. Cir.1987); Waldbaum v. Fairchild Publications, Inc., supra, 627 F.2d at 1295. Cf. Williams v. Pasma, 202 Mont. 66, 656 P.2d 212 (1982), cert. den. 461 U.S. 945, 103 S.Ct. 2122, 77 L.Ed.2d 1302 (1983) (the community was defined as the entire state of Montana). Here, the record indicates that any notoriety attributed to plaintiff, appears confined to Stafford Township.

III
There is yet another applicable alternative, that of limited purpose public figure status. In considering that status the examination focuses on whether plaintiff's dismissal was a "public controversy" or a "topic of legitimate public concern," and then the "nature and extent" of plaintiff's participation in the controversy. Sisler v. Gannett Co., Inc., 104 N.J. 256, 267 (1986); Barasch v. Soho Weekly News, Inc., 208 N.J. Super. 163, 173 (App.Div. 1986). See also Marcone v. Penthouse Intern. Magazine for Men, supra, 754 F.2d at 1082; Clark v. American Broadcasting Co., Inc., 684 F.2d 1208, 1218 (6th Cir.1982), cert. den. 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983); Waldbaum v. Fairchild Publishing, supra, 627 F.2d at 1296-1297; Avins v. White, 627 F.2d. 637, 647 (3rd Cir.1980), cert. den. 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980).
All disputes which may be of public interest are not public controversies, Time, Inc. v. Firestone, 424 U.S. 448, 458, 96 S.Ct. 958, 967, 47 L.Ed.2d 154, 165 (1976), and mere news-worthiness is insufficient to create a public controversy. Wolston v. Reader's Digest, Assn., Inc., 443 U.S. 157, 167-168, 99 *367 S.Ct. 2701, 2707, 61 L.Ed.2d 450, 460 (1979). A public dispute is one which affects the general public or some segment of it, and not just its immediate participants. Waldbaum v. Fairchild Publishing, Inc., supra, 627 F.2d at 1296; Marcone v. Penthouse Intern. Magazine for Men, supra, 754 F.2d at 1083. There must also be an assessment of whether an individual "voluntarily and knowingly engaged in conduct that one in his position should reasonably know would implicate a legitimate public interest, engendering the real possibility of public attention and scrutiny." Sisler v. Gannett Co., Inc., supra, 104 N.J. at 274 (operation of a bank); Dairy Stores, Inc. v. Sentinel Pub. Co., 104 N.J. 125, 144 (1986) (essentials of life such as food and water as matters of public interest).
There are two aspects to a defamation issue when questions of public concern are projected. Concern is not only with the fitness of defendant in his office, but in this case with plaintiff's fitness as an appointed municipal official. Both sides of the coin are properly the subject of legitimate public concern and interest. Hence, the inquiry must also focus on the nature of plaintiff's participation in what can be referred to as public controversy. If plaintiff's participation is more than an incidental or trivial participation in a public controversy, see Waldbaum v. Fairchild Publishing, Inc., supra, 627 F.2d at 1297, and plaintiff voluntarily entered the forefront of a public controversy in order to influence the outcome, then he may become the subject of legitimate public controversy. See, e.g., Lawrence v. Bauer Pub. & Print. Ltd., 89 N.J. 451, 464-465 (1982), cert. den. 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 395 (1982); Marcone v. Penthouse Intern. Magazine for Men, supra, 754 F.2d at 1082. See also Lerman v. Flynt Distributing Co., Inc., 745 F.2d 123, 136-137 (2nd Cir.1984), cert. den. 471 U.S. 1054, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985) (author as limited purpose public figure); Clark v. American Broadcasting Co., Inc., 684 F.2d 1208, 1218 (6th Cir.1982), cert. den. 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983) (no publicity sought and not a limited public purpose figure). The voluntary act of injecting *368 oneself into a public controversy results in undertaking the risk of comment in return. This voluntary undertaking also gives rise to the concept of fairness in being labeled a public person. A person voluntarily assuming a preeminent position in an association or organization is presumed to have accepted public-figure status. See, e.g., Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265, 1280 (3rd Cir.1979) (professional football player); Barry v. Time, Inc., 584 F. Supp. 1110, 1113-1115 (N.D.Cal. 1984) (university basketball coach at least a limited purpose public figure); Rosanova v. Playboy Enterprises, Inc., supra, 411 F. Supp. at 443 (reputed underworld figure). Cf. Lawrence v. Bauer Pub. & Print. Ltd., supra, 89 N.J. at 451 (president and secretary-treasurer of taxpayers' association).
In the absence of a specific "test" to determine if a party to a defamation action is a public figure, our courts have examined the degree of that party's participation in a particular activity to determine whether it was voluntary and with a purpose to influence the outcome. This examination includes the degree of exposure a party had in the press, and the extent to which that party had access to the media to have "a more realistic opportunity to counteract false statements than private individuals enjoy." Lawrence v. Bauer Pub. & Print. Ltd., supra, 89 N.J. at 464 (quoting Gertz v. Robert Welch, Inc., supra, 418 U.S. at 344, 94 S.Ct. at 3009, 41 L.Ed.2d at 808). See Gomez v. Murdoch, 193 N.J. Super. 595, 600 (App.Div. 1984). Other factors include a plaintiff's past conduct and the public reaction to his conduct. Waldbaum v. Fairchild Publishing, Inc., supra, 627 F.2d at 1297. However, merely because someone receives media attention or becomes associated with an organization which attracts public attention is not conclusive of public-figure status. Wolston v. Reader's Digest Ass'n, supra, 443 U.S. at 167-168, 99 S.Ct. at 2707-2708, 61 L.Ed.2d at 460; Time, Inc. v. Firestone, supra, 424 U.S. at 453-455, 96 S.Ct. at 964-966, 47 L.Ed.2d at 162-163. What is required is that plaintiff sought public attention or sought a position to which public attention attaches by his own voluntary purposeful action. *369 See Hutchinson v. Proxmire, supra, 443 U.S. at 134-136, 99 S.Ct. at 2687-2689, 61 L.Ed.2d at 430-432; Time, Inc. v. Firestone, supra; Waldbaum v. Fairchild Pub., Inc., supra, 627 F.2d at 1297.
Limited-purpose public figure status was found to exist for the president and secretary-treasurer of a taxpayer's association in Lawrence v. Bauer Pub. & Print. Ltd., supra, 89 N.J. at 451. There, the association was seeking a public referendum on the appropriation for a new municipal fire house. Both plaintiffs were active in obtaining signatures on petitions and attended public meetings to speak on the issue. They received requested press coverage and apparently had ready access to the media. Id. at 463-465. At some point a local newspaper printed a story that it had received information about some forged signatures on the petition, including some witnessed by plaintiffs. The newspaper printed this story and suggested that false swearing charges might be brought and the matter referred to the County Prosecutor. The plaintiffs sued the newspaper, its owners and publishers as well as a reporter, for defamation. Although the trial judge and this Court only considered the president of the organization a public figure because he had significant access to the media, our Supreme Court, utilizing factors referred to above, concluded that both plaintiffs were limited purpose public figures because of their voluntary, active and significant participation in a public controversy which had brought them a fair degree of media and public exposure. Id. at 464-465.
In the case before us the exact degree of Vassallo's involvement in GROW and whether plaintiff was a founder and leader of that group or merely a member in the subsequent recall campaign was not fully explored at trial. However, there was testimony which indicated that plaintiff joined GROW and was active in getting recall petition signatures. At some point, according to Vassallo's testimony, he attempted to put the issue of his dismissal and that of other township employees before *370 the Italian-American Club, thus raising a question as to whether the dismissals of certain municipal employees were an issue in the recall effort. The exact time frame in which this occurred is not clear from our reading of the record, although the proofs indicate that before the formation of GROW in 1983, plaintiff had prepared a letter for distribution by the Italian-American Club in October 1981 which dealt with the dismissals. The content of any public and media exposure Vassallo may have received during this period, the extent of his access to the media, and whether the dismissals of public employees were made campaign issues were not fully developed at trial. But regardless of Vassallo's participation in GROW, if he made public statements during this period dealing with the recall or the dismissals, these acts might also be sufficient to establish his limited-purpose public-figure status if he was somehow intending to influence the outcome of the election.
Public-figure status is a matter for determination by the Court. Lawrence v. Bauer Pub. & Print. Ltd., supra, 89 N.J. at 462; Gomez v. Murdoch, supra, 193 N.J. Super. at 599. The trial judge is required to make specific findings of fact on that status. Barasch v. Soho Weekly News, Inc., supra, 208 N.J. Super. at 173. Unfortunately, the trial judge failed to make such findings either at the trial or in connection with the new trial motion. Nevertheless, we have previously concluded that Vassallo may be considered both a public official and a public officer. The facts that were developed also tend, alternatively, to sufficiently establish a basis for a determination as a matter of law that plaintiff would also be considered a limited-purpose public figure.

IV
We turn now to the question of whether the letter written to the electorate by a public official during the course of a recall election and attempting to explain or justify certain personnel actions qualifies as a matter of public concern. In *371 our view, this clearly so qualifies, and the trial judge erred in failing to recognize this. Hence, even if Vassallo was considered neither a public figure nor a public official, he would still be required to prove actual malice if it appeared that his claim of defamation should be judged under a higher standard because it involved a matter of legitimate public concern and plaintiff had "voluntarily and knowingly engaged in conduct that one in his position should reasonably know would implicate a legitimate public interest, engendering the real possibility of public attention and scrutiny." Sisler v. Gannett Co. Inc., supra, 104 N.J. at 274. The actual malice standard would apply to an individual's statement in this category. Id. at 279. The higher standard of actual malice is utilized because (1) this State has a historical commitment through its Constitution and common law development to afford "scrupulous protection for speech on matters of public concern" id. at 271; and (2) the expressed belief in this State that an individual acting in such a manner relinquishes part of his reputation to the public eye even though he has not purposely thrust himself into a public forum. Id. at 274-275.
The individual plaintiff in the Sisler case was a co-founder and former board chairman of a bank. He retired in 1980. Defendant published a series of articles about undercollateralized loans which were allegedly improperly made by the bank to plaintiff to finance his horse farm, and discussed other questionable practices. It developed that various facts in these stories were incorrect, and defendant then published retractions. Because these articles interfered with various business ventures of plaintiff, he sued for defamation and obtained a verdict. Id. at 260. The Supreme Court held that plaintiff was not a public figure because he had not achieved any "especial prominence" in the affairs of society and indeed had avoided publicity. Id. at 269-270. The subject of the articles was a matter of legitimate concern, however, because of the historical public interest in stability of financial institutions. More significantly, plaintiff had "voluntarily and presumably knowingly *372 risked exposure on a matter of legitimate public concern" because he should have known from his experience that a large loan between a bank and its former founder would attract special scrutiny. The result was that his defamation claim was to be judged under the actual malice standard. Id. at 279.
Thus, and in the alternative, even if Vassallo was not considered a public figure or official to whom the actual malice standard applies, the subject matter of the defamatory communication was a matter of legitimate concern. It reflected upon Vassallo's fitness to hold an appointed municipal office of significance. In the context of the recall election, it touched on the administration of municipal government, the position of the mayor and how his political associates dealt with certain municipal employees. An examination of the record makes it abundantly clear that Vassallo had "sufficient experience and knowledge" in political affairs and had voluntarily conducted his affairs in such a way as to risk exposure and publicity. Vassallo took more than a passive interest in the recall effort and was no stranger to politics. His dismissal as building inspector had been a subject of notice in the local media. He also participated in the GROW movement and in circulating recall petitions. In that context it is reasonable to conclude that plaintiff's involvement in GROW and the recall gave rise to public comment about his prior dismissal. This invited public scrutiny on a matter of legitimate public concern. Hence, under the principles enumerated in Sisler his claim would have to be judged according to the actual malice standard.

V
We also consider Bell's argument that the publication complained of contains or involves matters of public concern under the doctrine of a common law qualified privilege of fair comment. Such a privilege was recognized in Dairy Stores, Inc. v. Sentinel Publishing Co., supra, 104 N.J. at 125, decided subsequent to the trial which is the subject of this *373 appeal. There, our Supreme Court acknowledged that "a qualified or conditional privilege has emerged as one of the prime means for the common law to balance the interests in reputation with the publication of information in the public interest." Id. at 137. This fair comment doctrine extends to virtually all matters of legitimate public interest, and goes beyond matters of opinion to statements of fact. Id. at 147-148. This accords with earlier decisions which recognized a privilege (which may be absolute or qualified) for statements in the public interest or "the common convenience and welfare." See Swede v. Passaic Daily News, 30 N.J. 320, 331 (1959); Coleman v. Newark Morning Ledger Co., 29 N.J. 357, 379 (1959). Availability of this privilege as a defense depends on the circumstances in a particular case, the situation of the parties and other factors. See Bainhauer v. Manoukian, 215 N.J. Super. 9 (App.Div. 1987).
In the Dairy Stores case it was concluded that a qualified fair comment privilege existed in a newspaper report concerning the purity of bottled water sold by the plaintiff. According to the court, the purity of a product intended for human consumption was a matter of legitimate public concern. The court recognized, however, that according to traditional defamation analysis a qualified privilege may be overcome by a showing of malice. While discarding the malice label, because of many meanings which the term has developed, the Court continued to adhere to the principle that to overcome a qualified privilege "a plaintiff must establish that the publisher knew the statement to be false or acted in reckless disregard of its truth or falsity." 104 N.J. at 151. The determination that is critical is whether the public interest in obtaining information "outweighs the individual's right to protect his or her reputation." Id. at 151. See also Coleman v. Newark Morning Ledger Co., supra, 29 N.J. at 376. The rule of reckless disregard applies regardless of whether defendant is a member of the media. 104 N.J. at 153.
*374 It thus follows that defendant's statements, involving matters of public concern, make defendant the holder of a qualified privilege which may be overcome only on a showing that defendant authored the statements with knowledge of their falsity or reckless disregard of the truth.

VI
At the very least, actual malice was required to be established to support a punitive damages award. Compare Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 759-760, 105 S.Ct. 2939, 2946, 86 L.Ed.2d 593, 604 (1985) (actual malice not required to support punitive damages award where statements do not involve matters of public concern) and Gertz v. Robert Welch, Inc., supra, 418 U.S. at 349-350, 94 S.Ct. at 3012, 41 L.Ed.2d at 811. See also Sisler v. Gannett Co., Inc., supra, 104 N.J. at 280.
Defendant asserts that imposition of punitive damages in a defamation action is contrary to the provisions of N.J. Const., Art. I, (1947) and to the Federal Constitution. Federal cases have now established that regardless of the status of a plaintiff, "the States may not permit recovery of presumed or punitive damages, at least where liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." Gertz v. Robert Welch, Inc., supra, 418 U.S. at 349-350, 94 S.Ct. at 3012, 41 L.Ed.2d at 811. See Dun & Bradstreet v. Greenmoss Builders, supra, 472 U.S. at 762-763, 105 S.Ct. at 2947-2948, 86 L.Ed.2d at 604-605 (plurality opinion).
Although the federal courts have expressed hesitancy in upholding large punitive damage awards, particularly where media representatives are involved, see Gertz v. Welch, supra, 418 U.S. at 349-350, 94 S.Ct. at 3011-3012, 41 L.Ed.2d at 811; Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 72-77, 91 S.Ct. 1811, 1833-1836, 29 L.Ed.2d 296, 328-331 (1971) (Harlan, J., dissenting); Lerman v. Flynt Distributing Co., supra, 745 F.2d at 141-142, punitive damages have not been held unconstitutional *375 if the appropriate burden of proof has been met. See e.g., Hunt v. Liberty Lobby, 720 F.2d 631, 650 (11th Cir.1983); Appleyard v. Transamerican Press, Inc. 539 F.2d 1026, 1029-1030 (4th Cir.1976), cert. den. 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977); Davis v. Schuchat, 510 F.2d 731, 736-738 (D.C. Cir.1975). A punitive damage award is not unconstitutional per se. However, courts may exercise their supervisory authority to reduce inherently excessive awards of punitive damages. Hunt v. Liberty Lobby, supra, 720 F.2d at 650 n. 34.
Nor have punitive damage awards been held unconstitutional by our courts in defamation cases. Our Supreme Court has noted that when considering punitive damages awards against public officials, the jury should be instructed using the actual malice standard. Burke v. Deiner, 97 N.J. 465, 476-477 n. 2 (1984). Unless and until our Supreme Court holds to the contrary, punitive damage awards are allowable in defamation cases, and are so allowable in such cases involving public officials or public figures or where matters of legitimate public concern are involved if there is a finding of actual malice. See Schiavone Const. Co. v. Time, Inc., 646 F. Supp. 1511, 1517 (D.N.J. 1986) (concluding that New Jersey law allows punitive damages in defamation actions).

VII
We turn now to the judge's charge to the jury. Since we have concluded that actual malice is the test for any recovery by plaintiff in this case, the charge of the trial judge to the jury was erroneous because it omitted an adequate actual malice charge.[6] Although defendant has asserted various errors in *376 the jury charge in his brief, he fails to acknowledge that with one exception no objection was made to the charge below. We note also that the attorneys for both sides made a generalized request for use of the relevant model jury charges. Ordinarily, a party requesting a particular jury charge cannot then assert on appeal that the charge was erroneous. Skripek v. Bergamo, 200 N.J. Super. 620, 632 (App.Div. 1985), certif. den. 102 N.J. 303 (1985). Nevertheless, we have considered the allegations under the plain error standard. R. 2:10-2.
A proper jury charge is essential to a fair trial. Campos v. Firestone Tire & Rubber Co., 98 N.J. 198, 210 (1984). The charge must not only correctly state the applicable law, it must also indicate how the law is to be applied. Jurman v. Samuel Braen, Inc., 47 N.J. 586, 591-592 (1966). Even a stipulation of counsel is not binding when it does not accurately reflect controlling law. State v. Elysee, 159 N.J. Super. 380, 384 (App.Div. 1978); Fivehouse v. Passaic Valley Water Commission, 127 N.J. Super. 451, 457-458 (App.Div. 1974), certif. den. 65 N.J. 565 (1974). The failure to employ the actual malice standard and to charge on the necessity of malice had a clear capacity for error and constitutes plain error here. Under the current state of defamation law, the charge was so inaccurate on legal issues as to constitute plain error requiring reversal.
Some additional comments on the charge are necessary. The trial judge had charged the jury that defendant Bell had the burden of proving truth and that plaintiff Vassallo could recover even if defendant believed the statements to be true. However, that aspect of the charge was affected by the status of plaintiff as a public figure or official. As a public figure or official, plaintiff has the burden of proving falsity. Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 775-776, 106 S.Ct. 1558, 1563-1564, 89 L.Ed.2d 783, 792 (1986); Garrison v. Louisiana, supra, 379 U.S. at 74, 85 S.Ct. at 215, 13 L.Ed.2d at 132 ("a public official might be allowed the civil remedy only if he establishes that the utterance was false and that it was *377 made with knowledge of its falsity or in reckless disregard of whether it was false or true.")
On the subjective state of defendant's mind, the trial judge instructed the jury that plaintiff could recover if defendant failed to prove the statements true "regardless ... of the good intentions of the defendant in publishing the statement and regardless of the fact that the defendant may honestly have believed in the truth of the statement published." This charge was erroneous since the actual malice standard applies. The instruction to the jury should have required it to determine whether defendant believed the statements he was making, and whether that belief was reasonable or whether he had recklessly disregarded information demonstrating falsity. See St. Amant v. Thompson, 390 U.S. 727, 730-731, 88 S.Ct. 1323, 1325-1326, 20 L.Ed.2d 262, 266-267 (1968); Dairy Stores, Inc. v. Sentinel Publishing Co., supra, 104 N.J. at 151; Lawrence v. Bauer Pub. & Print. Ltd., supra, 89 N.J. at 466.
In the trial judge's instructions he also told the jury that a finding of malice was necessary to overcome a qualified privilege and that malice was necessary for imposition of punitive damages. However, in both instances the judge equated malice with ill will or bad motive and stated that the motivation for the statement must be "an actual desire to harm the plaintiffs as distinguished from a desire to publish a statement which he honestly believed to be true." Those instructions were at variance with the direction in Burke v. Deiner, supra, 97 N.J. at 477, 479. While the trial judge used the term actual malice, he never defined it according to the New York Times standard. A qualified privilege may be overcome only on a showing of actual malice. See Dairy Stores, Inc. v. Sentinel Publishing Co., supra, 104 N.J. at 148-151; Dijkstra v. Westerink, 168 N.J. Super. 128, 136 (App.Div. 1979), certif. den. 81 N.J. 329 (1979). Dairy Stores settled the law that actual malice is defined as knowledge of falsity or reckless disregard of the truth. 104 N.J. at 151. Likewise, with respect to punitive *378 damages, plaintiff as a public figure is entitled to a charge premised on the requirements of actual malice in accordance with the New York Times standard. Hence, the judge's charge was clearly erroneous because of its improper definition of the term.[7]
Furthermore, when the trial judge charged on damages he said that "general damages are those which the law presumes to follow necessarily from the publication of the libel and which are recoverable by the plaintiff without proof of causation." [Emphasis added]. The judge added that such damages are presumed because they are not always capable of accurate measurement. His charge erroneously referred to presumed damages since states may not permit recovery of presumed damages even in a case involving a private plaintiff in the absence of a showing of knowledge of falsity or reckless disregard of the truth. Gertz v. Robert Welch, Inc., supra, 418 U.S. at 349, 94 S.Ct. at 3012, 41 L.Ed.2d at 810. Our Supreme Court recognized this rule in Sisler v. Gannett Co., Inc., supra, 104 N.J. at 281, and said that "concrete proof" of injury was required and that "inferred" damages were unacceptable. In the court's view an impermissible burden on First Amendment rights would occur if otherwise allowed.
Moreover, the trial judge mistakenly indicated that whoever had the burden of proof must satisfy that burden by a preponderance of the evidence. The New York Times standard requires that actual malice must be proven with "convincing clarity." See also Lawrence v. Bauer, supra, 89 N.J. at 466. Our review of the charge satisfies us that the necessity of *379 proving malice and damages with convincing clarity[8] was not clearly expressed.
Defendant did object to one portion of the judge's charge to the jury, and that was the following instruction:
With respect to the one that relates to the fact of solicitation of political contributions asserted against Mr. Vassallo, I think I should instruct you, of course, that there has been no testimony whatever on behalf of the defendant, Bell, that would indicate that the activities were performed during the working hours or that they were performed in a Township-owned vehicle. The testimony in that respect by Mr. Bell was with respect to something that he heard from sources that he cannot now recall.
At the conclusion of the charge defendant objected to that characterization of the evidence, but the trial judge refused to amend his instructions. Defendant argues that this was improper because there was testimony that plaintiff was soliciting funds in the afternoon as well as other testimony raising questions about whether plaintiff worked a full day or only part of the day at his township job. Defendant also testified that he had seen plaintiff in a township vehicle parked in front of a local automobile dealer and that plaintiff was there soliciting contributions. Defendant testified that he instructed plaintiff to stop this activity on a number of occasions. Bell did admit that he was initially told about the problem by third parties whose names he could not remember. He argues that the judge's instructions that it was the jury's recollection of the facts that would govern was insufficient to vitiate any prejudice.
*380 It is axiomatic that a trial judge has authority to comment on the evidence, although he should use care that an expression of opinion does not mislead the jury or is not unwarranted from the proofs and does not work to control the jury's findings. Ridgewood v. Sreel Inv. Corp., 28 N.J. 121, 128-129 (1958); Hare v. Pennell, 37 N.J. Super. 558, 566-567 (App.Div. 1955). Here, contrary to the judge's instruction, there was evidence which the jury could accept or reject regarding Vassallo's solicitation of moneys on township time and in a township vehicle. Even though the proofs were not strong, the comments of the judge, cast in the form of an instruction, could clearly have given the jury the notion that the issue was removed from their consideration. Hence, we consider that instruction to have been improper and one which should not be repeated on any retrial where similar evidence is presented.

VIII
With respect to plaintiff's argument that there was no basis in the record to support imposition of a punitive damage award, we need not deal with that issue at length in light of our conclusion that the actual malice standard applied and that there were erroneous instructions and comments in the charge. We have outlined the requirements of actual malice that must be met under the New York Times standard with respect to public officials, public figures and others before a punitive damage award may be warranted. We fully expect that on the remand of this matter any retrial will be in conformity with this opinion. If the evidence is sufficient to raise a question of fact regarding the existence of malice, then the question of whether actual malice exists is for the jury. Testimony at trial appeared to raise credibility issues regarding plaintiff's conduct and the validity of information given to defendant. Obviously, the jury, under a proper instruction as to the definition of actual malice, will have to decide credibility issues and whether defendant had knowledge of the falsity (if that is so found) of what he had written or whether he had recklessly disregarded information *381 questioning what he had written. Even though the jury found "actual malice," it was acting under an improper definition of the term. Hence, we do not reach the question of whether plaintiff established actual malice. We leave that for any trial on the remand or any summary judgment motion directed to that issue.
Reversed and remanded for a new trial in accordance herewith.
NOTES
[1] A mistrial was declared in Carletto v. Bell because the jury was unable to agree on a verdict.
[2] Defendant's brief does not address the dismissal of the counterclaim. Hence, we consider that issue to have been abandoned. Aiello v. Myzie, 88 N.J. Super. 187, 193 (App.Div. 1965), certif. den. 45 N.J. 594 (1965); L.P. Marron & Co. v. River Vale Tp. 54 N.J. Super. 64, 75 (App.Div. 1959); Gierkont v. Gierkont, 46 N.J. Super. 112, 119 (App.Div. 1957). See R. 2:6-2.
[3] Defendant asserts that the charges were never finally resolved, because there was a change in the structure of government of the township and this required reappointment of all municipal officials. Vassallo was not reappointed. There may also have been an intervening lawsuit. We do not rule on the correctness of this evidence ruling, but note that such facts may be relevant to good faith as well as the question of malice.
[4] As part of his counterclaim defendant asserted that plaintiff had prepared a two-page letter to be distributed through the local Italian-American Club in which plaintiff named a number of Italian-American residents who defendant had either fired or made allegations against in the past. The letter was apparently prepared in October 1981 during defendant's State Senate race. The leadership of the Italian-American Club refused to sponsor the letter, and it was never publicly distributed. Defendant received the letter in December 1983 from the plaintiff's brother-in-law. He was uncertain whether anyone else had seen the letter.

Ruling that the letter expressed only plaintiff's opinion, and was therefore not defamatory, the trial judge dismissed the counterclaim.
[5] He was also a construction official in other municipalities when the letter was published. Vassallo's holding of positions in other municipalities is not determinative.
[6] Our use of the term "malice" is the traditional shorthand way of referring to the New York Times standard. We do not imply by that use that the trial judge on the remand should also use that term in his instructions to the jury. See Dairy Stores, Inc. v. Sentinental Pub. Co., supra, 104 N.J. at 151; Bainhauer v. Manoukian, supra, 215 N.J. Super. at 41-42.
[7] A suit by a private figure may be contrasted with this standard when punitive damages are considered. See Dun & Bradstreet, Inc. v. Greenmoss Builders, supra, 472 U.S. at 751-760, 105 S.Ct. at 2941-2946, 86 L.Ed.2d at 597-603 (1985). See also Philadelphia Newspapers, Inc. v. Hepps, supra, 475 U.S. at 772-776, 106 S.Ct. at 1562-1563, 89 L.Ed.2d at 790-791.
[8] Although not discussed at the beginning of the charge, the judge in discussing the interrogatories to the jury did state that proof of malice had to be by convincing clarity. It is an open question as to whether the wording of the interrogatories submitted to the jury was amended to reflect that the convincing clarity standard applied to the malice. The trial judge had acknowledged defendant's objection and plaintiff's counsel said he would "take care of writing that in," but this does not appear to have been included in the interrogatories read to the jury when the verdict was taken. On the remand care must be taken to see that the proper verbiage is included.